IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**SHARON MCCULLAGH,**

        Plaintiff,

        v.

**SMARTMATCH INSURANCE AGENCY, LLC, and INTEREST MEDIA, INC.,**
        Defendants.

Case No. 1:25-cv-00174-CL

**FINDINGS AND RECOMMENDATION**

CLARKE, Magistrate Judge

    Plaintiff brings this putative class action against Defendants, SmartMatch Insurance Agency, LLC, and Interest Media, Inc., seeking to hold them liable under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, for alleged unsolicited telemarketing calls and text messages to her personal phone, which Plaintiff claims is registered on the National Do Not Call Registry.

    The case comes before the Court on the Defendants' Motion to Compel Arbitration (ECF #26). The Motion also seeks to strike the class allegations from Plaintiffs' First Amended Complaint ("FAC") (ECF #19). An oral argument hearing was held on Thursday, January 8, 2026. For the reasons below, the Motion (ECF #26) should be DENIED.

## FACTUAL BACKGROUND[1]

Plaintiff is an individual who resides in Lake, County, Oregon. FAC ¶ 4. Her telephone number has been on the National Do Not Call Registry since July of 2024. FAC ¶ 15. She claims that, despite this, she received at least 13 telemarketing calls from Interest Media, at the direction of SmartMatch Insurance Agency, LLC ("SmartMatch"). FAC ¶ 16. The calls were made for the purpose of offering Medicare supplemental health insurance. FAC ¶ 17. Plaintiff indicated that she was not interested in SmartMatch services during the first three calls. FAC ¶ 18.

Plaintiff claims that SmartMatch and Interest Media knew that their telemarketing calls were unwanted, and that they have faced previous lawsuits brought under the TCPA, but that they continued "to orchestrate an *en masse* telemarketing campaign," which included calling individuals whose numbers were on the Do Not Call Registry. FAC ¶ 30-40. Plaintiff therefore seeks to bring a class action against the Defendants, proposing the following Class definitions:

> **Interest Media National Do Not Call Registry Class:** All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Interest Media or a third party acting on Interest Media's behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.
>
> **SmartMatch National Do Not Call Registry SubClass**: All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Interest Media or a third party acting on Interest Media's behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint; (5) that advertised, or were intended to advertise, SmartMatch's goods and services.
>
> **Internal DNC Class**: All persons within the United States to whom: (1) Defendants (or a third-party acting on behalf of Defendants) sent (2) two or more telemarketing calls or text messages in a 12-month

---

[1] Facts in this section are as alleged in the First Amended Complaint (ECF #19), as well as the undisputed facts contained in the record so far.

> period, (3) who were not current customers of the Defendants at the time of the calls, (4) who had previously asked for the calls to stop and (5) within the four years prior to the filing of the Complaint.

FAC ¶ 63.

According to the Defendants, Interest Media is a marketing company that provides advertising and other services to clients through user-facing websites. Declaration of Jeremy Matthew Hoggatt ("Hoggatt Decl."), ¶ 2. Interest Media claims that one of the user-facing websites that it owns and operates is FreeSamplesProUSA.com (https://freesamplesprousa.com/) (the "Site"). *Id*. at ¶ 3. When a person registers with the Site, they are asked Survey questions, and the Site sends that person "offers" from the Site's partners and clients. The Site gathers personal data from the registration and the Survey questions, including name, age, email address, as well as the IP address of the person accessing the Site. This data is saved to an Interest Media database. *Id*. at ¶ 4.

Defendants assert that just before midnight, Pacific Time, on September 29, 2024, Plaintiff visited the Site online, registered, and agreed to the Site's Terms of Use, which included a mandatory arbitration provision and a class action waiver. Def. Mtn Compel, (ECF #26) p. 3, (citing Hoggatt Decl. ¶¶ 6-9). Plaintiff's purported agreement to these provisions is the basis of Defendants' current motion to compel arbitration and dismiss the class allegations.

Defendants also claim that, in connection with a response to a Medicare Survey question, prompted by the Site, Plaintiff consented to receive calls and texts from SmartMatch. This is the basis of their defense to Plaintiff's substantive claims under the TCPA.

Plaintiff, by contrast, claims that she never accessed the Site at all. She submits a Declaration (ECF #35), which states that she has never visited this Site, and that she would have no reason to do so. Plaintiff states that she has not and does not want Medicare supplemental

health insurance, nor does she want any "free samples" offered by Interest Media on the Site. Plaintiff asserts that, at the date and time that Defendants claim that she accessed the Site, she likely would have been asleep. She has no browsing history for September 29, 2024, or September 30, 2024. She states that, as such, she did not ever see any Terms of Use. She did not agree to a mandatory arbitration provision, nor did she agree to waive any class allegations.

## DISCUSSION

**I.   Defendants' motion to compel arbitration should be denied.**

Defendants' motion to compel arbitration should be denied, for now. If a jury determines that Plaintiff accessed and navigated the Site, then the case should be stayed and sent to arbitration under the FAA.

### a.   Legal standard for a motion to compel arbitration

Under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), when a motion to compel arbitration is filed, a "court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue … shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4; *see also Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020).

"The Act leaves no place for the exercise of discretion by a district court," *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); therefore, a federal court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). If the answer to both questions is yes, then the FAA requires a court "to enforce the arbitration agreement in accordance with its terms." *Id.*; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence that the parties formed an agreement to arbitrate. *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). The "denial of a motion to compel arbitration has the same effect as a grant of partial summary judgment denying arbitration." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008). Other district courts have therefore applied the same evidentiary analysis as for a summary judgment motion. *Jenkins-Brown v. Liberty Acquisitions Servicing, LLC*, No. 03:14-CV-01610-ST, 2015 WL 1757220, at *4 (D. Or. Apr. 16, 2015; *Cox*, 533 F.3d at 1119 (citing *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, 608 F.3d 1084, 1092 (9th Cir. 2010)). This Court finds that reasoning persuasive and will apply the same standard, viewing all inferences in the light most favorable to the non-movant.

1. **Whether a valid agreement to arbitrate exists.**

Whether a valid agreement to arbitrate exists depends on two issues, one factual and one legal. The first, factual, issue is whether Plaintiff accessed the Site at all. Assuming that Plaintiff did access the Site, the second, legal, issue is whether a valid contract was formed by that access.

    i.    **A jury must resolve the question of fact regarding whether Plaintiff accessed the Site and entered her information.**

The first issue is quite clear. If a court determines there are unresolved issues of material fact as to the formation of the arbitration agreement, the court must "proceed summarily" to a jury trial on the merits of that issue. 9 U.S.C. § 4. Here, viewing all inferences in the light most favorable to Plaintiff as the non-movant, a dispute of material fact exists, and a reasonable juror could find that Plaintiff did not access the Site near midnight on September 29, 2024. The parties agree that the jury must decide this question of fact.

> ii.   **If a jury finds Plaintiff accessed the Site, then a valid arbitration agreement exists.**

While the question of fact above precludes granting the motion to compel arbitration, the Court must also make a ruling on the second issue: whether a valid arbitration agreement exists. A ruling in Plaintiff's favor on this issue would preclude arbitration, regardless of Plaintiff's purported access of the Site.

The Court finds that, if Plaintiff accessed the Site and pressed the "Continue" button to register her email, then, as matter of law, she agreed to be bound to arbitrate her claims. "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Oregon law, contract formation "requires a 'bargain in which there is a manifestation of mutual assent to the exchange.'" *Homestyle Direct, LLC v. Dep't of Hum. Servs.*, 354 Or. 253, 262 (2013) (quoting Restatement (Second) of Contracts § 17 (1981) ("Restatement")). Mutual assent may be expressed "in words or inferred from the actions of the parties." *Id.*

The parties do not cite any Oregon-specific case law regarding how contract formation applies to the online setting. However, federal courts have applied analogous case law from other states that have similar "mutual assent"-based contract formation law, and the Ninth Circuit has "consistently stated that no differences exist in the law of the different states as to internet contract formation. *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025) (citing *e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 514–15 (9th Cir. 2023)). Courts have further explained that "[a]lthough 'new commerce on the Internet has exposed courts to many new situations' – and opened up useful new tools

through which contracting parties can communicate – 'it has not fundamentally changed the principles of contract.'" *Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 260 (4th Cir. 2021) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)); *see also, Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) (quoting the same language from *Register.com, Inc.*).

Internet contracts are classified "by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citing *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021). The first, a browsewrap agreement, is "one in which an internet user accepts a website's terms of use merely by browsing the site." *Id.* Courts have consistently held this type of agreement to be unenforceable, as individuals do not have "inquiry notice." *See Nguyen*, 763 F.3d at 1178–79.

The second form, a clickwrap agreement, requires users to click on an "I agree" box after being presented with a list of terms and conditions of use. *See id*. at 15, 20–21. Courts have "routinely found clickwrap agreements enforceable." *Berman*, 30 F.4th at 856 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Third, the agreement with the strongest notice is the scrollwrap agreement, where the user must scroll through all the Terms of Service before they can click the mandatory "I agree" box. *Id*.

Finally, a hybrid of the above, sign-in wrap agreements "are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up." *Sellers*, 73 Cal. App. 5th at 464 (citations omitted).

Here, Defendants submit undisputed evidence to show, that in order to access the samples and offers on the Site, a user had to register with the Site by entering their email address into an email field and clicking a button that said, "Continue." The Site did not require users to review the Terms of Service prior to clicking "Continue." Instead, a message in small font, underneath the "Continue" button stated:

> By clicking 'Continue', I agree to receive relevant emails from FreeSamplesProUSA and its partners. I also agree to the <u>Privacy Policy</u> which includes details on the collection and use of my personal data, and the <u>Terms of Use</u> which includes a mandatory arbitration provision, and this site's use of site visit recording technology provided by TrustedForm, Jornaya and Lucky Orange.

Hoggatt Decl., ¶ 7. Therefore, this is most like a sign-in wrap agreement. *See Keebaugh*, 100 F.4th at 1014 (citing *Sellers*, 73 Cal. App. 5th 444).

A sign-in wrap agreement may be an enforceable contract based on inquiry notice if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. To be conspicuous, notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Id.* While terms may be disclosed through hyperlinks, the presence of a hyperlink "must be readily apparent," and "[s]imply underscoring words or phrases ... will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* at 857 (citing *Sellers*, 73 Cal. App. 5th 444).

In this case, a screenshot of the page has been submitted to the Court for consideration. Hoggatt Decl., ¶ 7. The screenshot will be reproduced below, as well as being described, textually for the record:



The page consists of a bright orange banner, under which is a message in bold, black, all-caps typeface, which states: "GET YOUR FREE SURPRISE SAMPLES BOX!" An image of a

Page 9 – FINDINGS AND RECOMMENDATION

large, gift-wrapped box sits under the type, and large red arrows point down to the email field below, encouraging the user to, "Confirm email address." Inside the email field, a further message states in all-caps: "ENTER EMAIL ADDRESS." Under that email field is a large, bright green button, which states in large, bold, white font: "Continue." Under the large, bright green button, is the paragraph of text, in tiny black font, stating the message (quoted in full above) that, by clicking Continue, the user agrees to the Privacy Policy and the Terms of Use "which includes a mandatory arbitration provision." The words "Privacy Policy" and "Terms of Use" are not black like the rest of the text, but blue, and underlined, indicating that they contain a hyperlink.

While the Site's fonts and graphics are very distracting for the user, and they encourage the user to enter their email address and click "Continue," the fine print underneath the "Continue" button is readable, and it clearly gives notice to the user that clicking "Continue" will provide assent to the Site's Terms of Use. While the user is not forced to view all of the terms prior to assenting, the message explicitly informs the user that clicking "Continue," means they agree to a mandatory arbitration provision. This is sufficient for inquiry notice as to the mandatory arbitration agreement.

Therefore, if a jury finds that Plaintiff was the user who entered Plaintiff's email address into the data field and clicked "Continue," then, as a matter of law, Plaintiff assented to the mandatory arbitration provision of the Terms of Use.

**2. The agreement to arbitrate encompasses the dispute at issue in this case.**

As discussed above, if a jury finds that Plaintiff accessed and navigated the Site, as alleged by the Defendants, then a valid agreement to arbitrate exists, satisfying the first issue for

the Court's determination under the FAA. *Chiron Corp.*, 207 F.3d at 1130. The second issue for the Court's determination is whether Plaintiff's claims fall within the scope of the agreement. *Id.*

The Arbitration Agreement provisions of the Site's Terms of Use state:

> You and we each agree that any all disputes or claims with or against any party that relate to or arise from your use of or access to the Website, or any products or services sold, offered, or purchased through the Website shall be resolved exclusively through final and binding arbitration[.]

Hoggatt Decl. ¶ 8; *id.* at Ex. B p.4.

The Defendants argue that the issue of scope must be determined by the arbitrator, due to the delegation clause contained in the Terms of Use. This is partially correct. "Parties to an arbitration agreement may "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (citations omitted). If parties to an arbitration agreement have "clear[ly] and unmistakab[ly]" agreed to delegate issues of arbitrability to the arbitrator, then the court cannot override that intention, and the arbitrator must decide these threshold issues. *See Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citations omitted); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). Nevertheless, the Court has authority to consider the threshold questions of 1) whether a contract was formed, and 2) whether the claims at issue in the case fall within the scope of the agreement. *Chiron Corp.*, 207 F.3d at 1130; *Granite Rock Co.,* 561 U.S. at 299.

Here, while Plaintiff's claims, on their face, do not appear to arise out of the use of or access to the Site, the Defendants' defense clearly implicates that use. If a jury determines that Plaintiff used or accessed the Site, then this case falls within the scope of the agreement.

Additionally, as argued by Defendants, if Plaintiff assented to the Arbitration Agreement, then all other issues of arbitrability fall to the arbitrator to decide. The Site's Terms of Use include a delegation clause:

> The arbitrator, and not any federal, state, or local courts or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement to Arbitrate, any part of it, or of this Agreement to Arbitrate or this Agreement is void or voidable.

Hoggatt Decl. ¶ 8; *id*. at Ex. B p.4. Thus, many of the remaining issues raised by Plaintiff are reserved to the arbitrator. This includes the question of whether the named Defendants in this case can enforce the Arbitration Agreement.[2] Whether or not Plaintiff properly waived her right to bring class action allegations under the Terms of Use is also an issue for the arbitrator, if the case proceeds to arbitration.

Finally, Plaintiff's arguments regarding the Federal ESIGN Act are misplaced and premature. Plaintiff asserts that the Arbitration Agreement, and any consent therefrom obtained for telemarketing phone calls, is legally deficient because it did not comply with the requirements of the ESIGN Act, 15 U.S.C. § 7001(c). This may be true as to consent under the TCPA, which requires signed, written consent. 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(a)(2). As discussed thoroughly above, however, this requirement does not apply to the Arbitration Agreement contained in the Terms of Use, which is subject only to the basic

---

[2] Defendants have submitted undisputed evidence to show that FreeSamplesProUSA.com is an assumed business name, owned by Defendant Interest Media. Plaintiff claims that, lacking registration of such an assumed business name in Oregon, Defendants are precluded from participating in this case under ORS § 648.005, *et al*. This is incorrect. ORS § 648.135(1) states that a person who "carries on, conducts or transacts business" without registering their assumed business name "shall lack standing before the courts of this state to maintain a cause of action for the benefit of the business." The statute is silent as to the entity's ability to defend itself against a cause of action brought by someone else, in federal court. Regardless, any further issues of enforceability are issues must be addressed by the arbitrator, or by the Court, after the jury resolves the questions of fact.

Page 12 – FINDINGS AND RECOMMENDATION

contractual requirements, such as mutual assent. Therefore, if the case proceeds to arbitration, the arbitrator will consider whether Plaintiff properly consented to the phone calls under the TCPA and the ESIGN Act. If a jury determines that Plaintiff did not access the Site, then consent will be a question for the Court upon a motion for summary judgment.

## II.    Questions of fact preclude an order striking the class allegations.

Defendant moves to strike Plaintiff's class allegations under Fed. R. Civ. P. 12(f) and 23(c). The standard for striking under Rule 12(f) is strict. *In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig.*, 583 F. Supp. 1388, 1400 (E.D. Pa. 1984). Rule 12(f) motions to strike are "viewed with disfavor" and "not frequently granted," *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015). Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

In applying this standard to class actions, courts have noted that "these limited categories" "do not map neatly onto a class allegation." Such an allegation is not a defense, is not redundant, is not impertinent, and is not scandalous. "At most, it might be said that a facially deficient class allegation is 'immaterial,' but even that is something of a stretch." *Canady v. Bridgecrest Acceptance Corp.*, No. CV-19-04738-PHX-DWL, 2022 WL 279576, at *3 (D. Ariz. Jan. 31, 2022) (citing 1 Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 23, at 632 (2020) (characterizing as "problematic" the use of Rule 12(f) to strike class allegations)).

Whether or not Plaintiff accepted the Terms of Use is a question of fact, which must be determined by a jury. Certainly, such an inquiry does not easily lend itself to applicability to a class, but if a jury finds that Plaintiff did not accept the Terms of Use, then the class action

waiver would not apply to her claims and Defendant's arguments about individual factual issues regarding use of the Site would be inapposite. Plaintiff may need to amend her allegations or her proposed class definitions to ensure that issues of law and fact predominate over issues involving individual class members, but outright dismissal at this time is premature, especially considering the disfavor accorded to Rule 12(f) motions. The Motion to Strike should be denied.

## RECOMMENDATION

For the reasons above, Defendants' Motion (ECF #26) should be DENIED. A trial on the issue of Plaintiff's use and access of the Site should be set immediately.

## SCHEDULING

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is entered. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See* Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this __11__ day of February, 2026.



MARK D. CLARKE
United States Magistrate Judge